UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

DILLON THOMPSON                                                    Plaintiff

v.                                      Civil Action No. 3:24-cv-00243-RGJ-CHL

LOUISVILLE JEFFERSON COUNTY                                        Defendant
METRO GOVERNMENT

* * * * *

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant Louisville Jefferson County Metro Government's ("Metro") motion for summary judgment. [DE 41]. Plaintiff Dillon Thompson ("Thompson") responded [DE 42], and Metro replied [DE 43]. Briefing is complete and the matter is ripe. For the reasons below, the Court **GRANTS IN PART** and **DENIES IN PART** Metro's motion for summary judgment [DE 41].

### I.        BACKGROUND

Thompson began working for the Louisville Metro Police Department ("LMPD"), a Metro department, in February 2017. [DE 42-1, Declaration of Dillon Thompson, at 760]. Throughout his time in the LMPD, Thompson received several awards and commendations, including the 2018 Bluecoat Award for Officer of the Year and a number of Distinguished Life Saving Certificates of Honor. [*See* DE 42-2]. Thompson served in the Sixth Division of the LMPD until accepting a temporary duty assignment with the Traffic Unit in September 2022. [DE 41-4, Thompson Dep., at 571; DE 41-2, Professional Standards Unit ("PSU") Investigation, at 425]. In November 2022, he transferred permanently to the Traffic Unit, where Sergeant Robert Ward ("Ward") served as his direct supervisor. [DE 41-2 at 425; DE 42-3, Ward Dep., at 800–01].

1

Thompson's son, born in 2021, suffered from repeated ear infections, vomiting and diarrhea, and respiratory issues. [DE 42-1 at 760; DE 42-14]. Thompson feared that his son may have contracted the same autoimmune disease—histiocytosis X—that Thompson suffered from and that caused Thompson to develop a brain tumor as a child. [DE 42-1 at 760]. His son's medical issues required frequent trips to the pediatrician and ENT. [*Id.* at 761]. Thompson asserts that, during his interview to join the Traffic Unit, he was asked if there was anything that would stop him from following through with the position, to which he responded that his son had ongoing health problems and that he may need to take days off to care for him. [*Id.* at 761].

Upon his transfer to the Traffic Unit, Thompson was required to complete three 80-hour crash investigation training courses in Lexington, Kentucky. [DE 41-2 at 425; DE 41-1 at 400; DE 42 at 738]. The first of the Traffic Unit training courses took place from December 5 to December 16, 2022; the second from January 23 to February 2, 2023; and the third from March 6 to March 17, 2023. [DE 41-2 at 425]. Thompson was enrolled in these courses with four other LMPD detectives, including Darrell Wagner ("Wagner"). [*Id.*].

The parties agree that Thompson missed two full days and a partial day of the required training. [DE 41-1 at 400; DE 42 at 738]. His first full absence occurred on December 15, 2022, when, according to Thompson, he was suffering from a stomach bug and fever. [DE 41-2 at 427; DE 41-4, Thompson Dep., at 579]. Thompson notified the course instructor that he would be absent that day but did not notify Ward, in contradiction of LMPD policy. [DE 41-2 at 426–27; DE 41-4 at 578]. Thompson's partial absence occurred on March 8, 2023, when he left class two hours early to meet a roofer regarding storm damage to his house. [DE 41-2 at 427; DE 41-4 at 581–82]. Thompson again notified no one from LMPD that he was leaving early that day. [DE 41-4 at 582]. Thompson's second full absence took place on March 10, 2023, when he stayed home to care for

his sick son. [*Id.* at 583–85]. Again, Thompson did not notify Ward or anyone from LMPD about his absence, but he stated that he attempted to contact Charles Presley ("Presley"), the course instructor, three times to notify him. [*Id.* at 585; DE 41-2 at 426].

Thompson's absences were not revealed to Ward until March 10, 2023—the day of Thompson's second full absence. [DE 41-2 at 426]. On that day, Wagner created a group chat with Ward and Thompson, among others, and texted, "Hey thompson, you okay? You didn't show up the whole day and we ain't heard anything from you." [DE 41-2 at 426]. Thompson responded that his son had COVID[1] and that he did not want to come until he had taken a test. [DE 41-4 at 587–88]. The next day, Thompson texted Wagner individually, stating,

> Hey [I] just wanted to let you know I really didn't appreciate how you were trying to get on me in the group chat with sarge. If you were trying to get a point across just text me not everyone else bro. It's not everyone's business and yesterday wasn't planned and I couldn't do anything else about it. I did what [I] had to do with letting [Presley] [k]now.

[DE 41-2 at 426; DE 41-4 at 588]. Wagner's text prompted Ward to request copies of the class sign-in sheets from Presley and escalate the matter to the PSU investigator. [DE 41-2 at 426]. Chief Jacquelyn Gwinn-Villaroel ("Gwinn-Villaroel") then initiated the PSU investigation. [*Id.* at 425].

Sergeant Andrew Meyer ("Meyer") conducted the investigation and presented his findings in a report dated July 5, 2023. [DE 41-2 at 424]. According to the report, Presley sent scans of the attendance records to Ward for three instances. [DE 41-2 at 428]. The first scan, which included attendance records through March 13, 2023, showed a blank box next to Thompson's name for the March 10 class, indicating that he had not initialed to signify his attendance that day. [*Id.* at 428]. The second scan, which included records through March 14, showed that Thompson's initials had been placed in the previously blank box for the March 10 class. [*Id.*]. The final scan, which was

---

[1] Thompson later revealed that he simply suspected that his son had COVID. [DE 41-4 at 616]. A test revealed that his son did not have COVID. [*Id.*].

3

provided after the conclusion of the course, revealed that Presley had whited out Thompson's initials and replaced them with the letters "ME" to signify a "medical emergency." [*Id.* at 429]. Metro maintains that the presence of Thompson's initials on the second scan is evidence that Thompson "added his initials days later[.]" [DE 41-1 at 402]. During his interview for the PSU investigation, Thompson confirmed that he signed the daily attendance record for the March 10 class at some point after March 13 because the class instructor directed them to "[g]o through and sign everything that's not filled in." [DE 42-13 at 900]. When questioned about the same during his deposition, Thompson testified that he did not remember signing his initials for March 10. [DE 41-4 at 596–98].

The investigation also revealed that Thompson reported 1.5 hours of overtime for March 8, the day he left class two hours early. [DE 41-2 at 432]. Thompson stated that he did so because Ward had instructed the officers to report overtime for the travel time to and from Lexington, given that the drive would require officers to work hours in excess of the standard eight-hour shift. [*Id.*; DE 41-4 at 582]. In other words, even though Thompson's drive that day did not cause him to exceed eight hours, he believed he was still permitted to submit overtime. Thompson testified that he did not realize that he should not have reported overtime when he did not work a full shift. [DE 41-4 at 582–83].

Finally, the report revealed that Thompson's hours in AgencyWeb—LMPD's time keeping tool—incorrectly reflected that Thompson worked full days on the days of his absences. [DE 41-2 at 427, 431]. When asked about this discrepancy during the investigation, Thompson confirmed that the AgencyWeb hours were incorrect and stated, "I never put in for a sick day. I never asked for a sick day. It's just too much going on in my life right now." [DE 42-13 at 898].

Thompson did not contact Ward about his absences until March 14, 2023, [DE 41-4 at 502], after which Ward directed him to write a memorandum explaining his absence. [*Id.*; DE 42-3, Ward Dep., at 816]. The PSU investigation report reflects that Thompson wrote the first of two memoranda on March 14, 2023, describing just the details of his March 10 absence. [DE 42-1 at 426]. Upon Ward's request, Thompson wrote a second memorandum explaining his other two absences. [*Id.*]. Thompson explained that he missed the December 15 class because he was "sick with the stomach bug and fever" and that his absence was "cleard [sic] by the instructor since multiple [other] people were out sick as well." [DE 42-4, Thompson Memo, at 817]. As to his early departure on March 8, he explained that he "got approval to leave from school at 1430hrs" to meet someone to check his roof for storm damage. [*Id.*]. As to the March 10 absence, Thompson stated that he had been up most of the night caring for his sick son and "could not think properly due to not sleeping[.]" [*Id.*]. Because of this, Thompson explained, he "did not contact [his] command officer when [he] was supposed to do so (one hour before [his] shift started)." [*Id.*]. Thompson explained that he attempted to contact the class instructor throughout the day but was unable to reach him. [*Id.* at 818].

In addition to providing written memoranda, Thompson participated in an interview with Meyer on June 13, 2023. [DE 42-13]. During the interview, Thompson expressed that he was experiencing personal stressors due to his son's poor health and that this caused his failure to notify Ward of his absence. [*Id.* at 896]. In explaining his March 10 absence, Thompson stated that he had been up all night caring for his son, that he advised Presley that morning that he would try to be in class around 10:00 am, and that he tried finding a babysitter. [*Id.*]. He also shared details of his March 14 conversation with Ward, during which Thompson told Ward that he was "overwhelmed" by his personal life. [*Id.* at 899]. Thompson claimed that "they have given me

multiple opportunities to step out of the unit. And I have tried my hardest and been to every scene that I was allowed to go to and put in the dedication to show that I want to be here." [*Id.*].

The PSU investigation concluded that Thompson violated LMPD Standard Operating Procedure ("SOP") 2.9.5 for absence from work, LMPD SOP 2.33.1 for misreporting overtime, LMPD SOP 5.1.3 for "conduct unbecoming," and LMPD SOP 5.1.5 untruthfulness; that is, for allegedly signing his initials for a day he was not present. [DE 41-2 at 430–38]. On September 22, 2023, Chief Gwinn-Villaroel notified Thompson of the LMPD's intent to terminate him based on (1) his failure to accurately reflect his shift schedules on LMPD's time keeping software when absent from work December 15, 2022, March 8, 2023, and March 10, 2023; (2) requesting three hours of overtime on March 8, 2023, despite leaving two hours early; (3) failing to properly notify his commander of his absences on the three dates in question; and (4) placing his initials on the daily attendance record for the March 10 training class when he was absent. [DE 42-7 at 863–64]. Gwinn-Villaroel also notified Thompson that he would be given an opportunity to present "additional information or mitigating factors" at a pre-termination hearing. [*Id.* at 863]. On November 1, 2023, Thompson resigned in lieu of termination, before the scheduled hearing. [DE 42-8].

In his deposition, Thompson testified that he never requested FMLA leave for himself or his son. [DE 41-4 at 6 47, 653]. Thompson also confirmed that his son has not been diagnosed with any disabilities and Thompson has not filed for accommodations under the Americans with Disabilities Act ("ADA"). [DE 41-4 at 631].

Thompson's second amended complaint asserts that Metro interfered with his FMLA rights (Count I), breached the contract between LMPD and the River City FOP labor union (Count III), violated the ADA (Count IV), and owes him punitive damages (Count V). [DE 26 at 208–20].

6

## II.    STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The essential inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

The movant has the initial burden to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant, who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256 (discussing Fed. R. Civ. P. 56(e)). "The court must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Sagan*, 342 F.3d at 497 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  Both parties must support their assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). Alternatively, either party may carry its burden by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." *Id.* 56(c)(1)(B).

It is not enough for the nonmovant to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586 (1986). Rather, the nonmovant must

7

sufficiently allege a fact that, if proven, "would have [the] effect of establishing or refuting one of essential elements of a cause of action or defense asserted by the parties." *Midwest Media Prop., L.L.C. v. Symmes Twp., Ohio*, 503 F.3d 456, 469 (6th Cir. 2007) (alteration in original) (quoting *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)) (internal quotation marks omitted). The nonmovant must do so by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute[.]" Fed. R. Civ. P. 56(c)(1); *see also Shreve v. Franklin Cty., Ohio*, 743 F.3d 126, 136 (6th Cir. 2014). If the nonmoving party does not respond with specific facts showing a genuine issue for trial, summary judgment is appropriate. *Emmons v. McLaughlin*, 874 F.2d 351, 353 (6th Cir. 1989).

### III.   DISCUSSION

A.  FMLA Interference (Count I)

The FMLA entitles eligible employees to take up to twelve weeks of leave during any twelve-month period "[i]n order to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition." 29 U.S.C. § 2612(a)(1)(C). Employees who return to work within the twelve-week statutory period are entitled to return to their previous position or an equivalent position. *Id.* § 2614(a)(1). Section 105 of the FMLA, codified at 29 U.S.C. § 2615, prohibits covered employers from interfering with, restraining, or denying the exercise of their employees' rights under the statute, and also makes it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)–(b). This provision gives rise to two distinct theories of recovery: interference (or entitlement) and retaliation. *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 507 (6th Cir. 2006).

8

Relevant here, the interference theory asks "whether the employer provided its employee the entitlements set forth in the FMLA." *Id.* "If an employer interferes with the FMLA-created right to medical leave or to reinstatement following the leave, a violation has occurred." *Arban v. W. Pub. Corp.*, 345 F.3d 390, 401 (6th Cir. 2003). FMLA interference claims are subject to the burden shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Donald v. Sybra, Inc.*, 667 F.3d 757, 762 (6th Cir. 2012) (explaining that *McDonnell Douglas* applies to interference claims as well as retaliation claims); *Clemons v. Hillshire Brands Co.*, No. 23-5622, 2024 WL 3355379, at *2 (6th Cir. Apr. 11, 2024). To that end, the employee has the initial burden of establishing a *prima facie* case of interference. *Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 427 (6th Cir. 2014). If he does so, the burden shifts to the employer to demonstrate a legitimate, non-discriminatory reason for its actions. *Id.* The burden then shifts back to the plaintiff, who must rebut the employer's proffered reason by showing it to be pretextual; that is, "that the proffered reason had no basis in fact, did not motivate the termination, or was insufficient to warrant the termination." *Donald*, 667 F.3d at 762. To establish a *prima facie* case of FMLA interference, an employee must show that:

> (1) he was an eligible employee; (2) the defendant was a covered employer under the FMLA; (3) he was entitled to take leave under the FMLA; (4) he notified his employer of his intent to take leave; and (5) the employer denied him benefits or rights to which he was entitled under the FMLA.

*Id.*; *see also Edgar*, 443 F.3d at 507.

Metro asserts that Thompson "is unable to satisfy the last two (2) required criteria" of his *prima facie* case. [DE 41-1 at 405]. Because Metro also disputes whether Thompson's son's illness entitled Thompson to take FMLA leave, [*Id.* at 406 n.2], the Court also addresses prong 3. Metro maintains that, while an employer can be held liable for failing to respond to an employee's inquiries and inform him of his FMLA eligibility, Thompson never requested FMLA leave. [*Id.* at

9

406]. Metro explains that "[t]here was no way for LMPD to know that [Thompson's] son was allegedly chronically sick" and that Thompson even testified that "his son has not been diagnosed with any chronic illness." [*Id.* at 406, n.2]. Thompson responds that there is a genuine issue of fact regarding whether these three prongs are met. [DE 42 at 746]. First, there is evidence that Thompson was entitled to take FMLA leave because Thompson testified that he believed his son might have COVID and because his son had a documented history of medical issues. [*Id.* at 747]. Second, there is evidence that Thompson met the notice requirement because he gave the LMPD enough information to conclude that he could be entitled to FMLA leave. [*Id.* at 747–78]. Third, there is a dispute of fact as to whether Thompson's proposed termination denied him FMLA benefits, given that Gwinn-Villaroel testified that this situation "would not . . . exist" if Thompson had requested leave. [*Id.* at 749].

*1. Entitlement to Take Leave (Prong 3)*

The FMLA "entitle[s] employees to take reasonable leave for medical reasons, for the birth or adoption of a child, and for the care of a child, spouse, or parent who has a serious health condition." 29 U.S.C. § 2601(b)(2). The statutory language of the FMLA defines "serious health condition" as "an illness, injury, impairment, or physical or mental condition that involves– (A) inpatient care in a hospital, hospice, or residential medical facility; or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11). Thompson makes no attempt to argue that he or his son suffered from a condition that required inpatient care, so he must rely on (B)—that he or his son suffered from an illness that involved continuing treatment by a health care provider.

The Department of Labor has issued regulations containing guidance on what constitutes a "serious health condition involving continuing treatment" under § 2611(11)(B). *See* 29 C.F.R. §

825.115. The regulation defines "serious health condition involving continuing treatment by a health care provider" to include:

> (a) Incapacity and treatment. A period of incapacity of more than three consecutive, full calendar days, and any subsequent treatment or period of incapacity relating to the same condition[.]
>
>  . . .
>
> (b) Pregnancy or prenatal care. Any period of incapacity due to pregnancy, or for prenatal care. . . .
>
> *(c) Chronic conditions. Any period of incapacity or treatment for such incapacity due to a chronic serious health condition. . . .*
>
> . . .
>
> (d) Permanent or long-term conditions. A period of incapacity which is permanent or long-term due to a condition for which treatment may not be effective. . . . Examples include Alzheimer's, a severe stroke, or the terminal stages of a disease.
>
> (e) Conditions requiring multiple treatments. Any period of absence to receive multiple treatments (including any period of recovery therefrom) by a health care provider or by a provider of health care services under orders of, or on referral by, a health care provider, for:
>
> > (1) Restorative surgery after an accident or other injury; or
> >
> > (2) A condition that would likely result in a period of incapacity of more than three consecutive, full calendar days in the absence of medical intervention or treatment, such as cancer (chemotherapy, radiation, etc.), severe arthritis (physical therapy), or kidney disease (dialysis).

29 C.F.R. § 825.115 (emphasis added). Though Thompson fails to state explicitly which of the above provisions he relies on, his repeated references to his son's purported chronic illness [DE 42 at 740, 742, 747, 752] suggest that he relies on 29 C.F.R. § 825.115(c)—"chronic conditions."

> The regulation defines "chronic condition" as one which:
>
> (1) Requires periodic visits (defined as at least twice a year) for treatment by a health care provider, or by a nurse under direct supervision of a health care provider;

11

> (2) Continues over an extended period of time (including recurring episodes of a single underlying condition); and
> (3) May cause episodic rather than a continuing period of incapacity (e.g., asthma, diabetes, epilepsy, etc.).

29 C.F.R. § 825.115(c). Further, the term "incapacity" means "inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefore, or recovery therefrom." 29 C.F.R. § 825.113(b).

Thompson states that "he was concerned that his son was experiencing COVID-19 symptoms and wanted to get his son tested" and that "[a] reasonable jury could consider Covid-19 as an FMLA qualifying event." [DE 42 at 747]. Though his son tested negative for COVID, he maintains that there is a "genuine issue of fact as to whether this was a[n] FMLA qualifying event" given his son's history of illness. [Id.]. As evidence of his son's history of medical issues, Thompson presents his son's medical records, which span from June 30, 2021 to November 29, 2023. [DE 41-12].[2] The records show that Thompson's son periodically visited the pediatrician throughout that time for vomiting and diarrhea, congestion, eye swelling and drainage, allergies, respiratory issues, and ear infections. [Id.]. Thompson also cites his own deposition testimony, in which he testified that his son is at a high risk of developing the same condition—histiocytosis X—that Thompson suffers from. [DE 41-4 at 617]. In reply, Metro argues that Thompson provides no evidence that his child suffered from "a single underlying condition that continued over an extended period of time" but rather "states that his son suffered from several ailments commonly experienced (ear infections, fevers, diarrhea, and vomiting)." [DE 43 at 955]. Moreover, Thompson offers no evidence that his son suffers from histiocytosis X, [id.], and he confirmed that his son has not been diagnosed with any chronic illness [DE 41-1 at 406].

---

[2] The medical records show visits on June 30, 2021; September 13, 2021; October 1, 2021; October 8, 2021; November 4, 2021; November 19, 2021; March 14, 2022; June 14, 2022; July 11, 2022; October 13, 2022; November 9, 2022; April 25, 2023; August 18, 2023; and November 29, 2023.

12

The record is clear that Thompson's son has not been diagnosed with any chronic conditions. Thompson testified that his son has been tested for histiocytosis X but "that they haven't found anything yet." [DE 41-4 at 584]. He also confirmed that his son has never had COVID and has never stayed overnight in a hospital for sickness. [*Id.* at 615–16]. When asked if his son suffered from any other medical issues beyond what was present in the medical records, Thompson stated that he had not. [*Id.* at 618]. Finally, Thompson confirmed that his son has never been diagnosed with a disability or a "physical or mental impairment" [*Id.* at 623–24].

The record reflects that Thompson's son suffered bouts of short-term ailments such as viral respiratory infections, colds, coughs, congestion, diarrhea, vomiting, and allergies. [DE 42-14]. Yet the legislative history of the FMLA reveals that it "'is not intended to cover short-term conditions for which treatment and recovery are very brief.'" *Morris v. Fam. Dollar Stores of Ohio*, Inc., 320 F. App'x 330, 337 (6th Cir. 2009) (quoting S. Rep. No. 103–3, at 28 (1993), *as reprinted in* 1993 U.S.C.C.A.N. 3, 30). "Conditions or medical procedures that would not normally be covered by the legislation include minor illnesses which last only a few days and surgical procedures which typically do not involve hospitalization and require only a brief recovery period." *Id.* (quoting S. Rep. No. 103–3, at 28 (1993)). The medical records show that Thompson's son was seen predominantly for upper respiratory infections, congestion, ear infections, gastrointestinal issues, and pharyngitis—all medical issues that courts have repeatedly found the be "minor" and thus not covered by the FMLA. *See Beaver v. RGIS Inventory Specialists, Inc.*, 144 F. App'x 452, 456 (6th Cir. 2005) (explaining that "bronchitis, sinusitis, and ear infection[s] . . . are all routine, short-term illnesses not covered by the FMLA"); *Brannon v. OshKosh B'Gosh, Inc.*, 897 F. Supp. 1028, 1035–36 (M.D. Tenn. 1995) ("[A]n upper respiratory infection, gastroenteritis and pharyngitis seem more akin to 'minor illness[es] which last only a few days,'

13

something Congress sought to exclude from FMLA coverage."). Thompson's son's high risk for histiocytosis X does not turn these periodic ailments into chronic conditions, particularly given that he "has not tested positive for histiocytosis X . . . ." [DE 42 at 751].

Finally, to the extent Thompson argues that he was entitled to FMLA leave for his own illness, he has not presented sufficient evidence that his condition requires periodic treatment by a health care provider, continues over an extended period of time, and may cause episodic periods of incapacity. Accordingly, Thompson has not shown a genuine dispute as to whether he or his son had a "continuous health condition involving continuing treatment" that would qualify him for FMLA leave.

### 2. Notice to Employer (Prong 4)

Even if Thompson could establish a genuine issue of fact with respect to whether his son suffered from a chronic condition, he must also demonstrate that he provided sufficient notice to the LMPD of his intent to take leave. "'[T]o invoke the protection of the FMLA, an employee must provide notice and a qualifying reason for requesting the leave'—'nothing in the statute places a duty on an employer to affirmatively grant leave without such a request or notice by the employee.'" *Miles v. Nashville Elec. Serv.*, 525 F. App'x 382, 385 (6th Cir. 2013) (quoting *Brohm v. JH Props., Inc.*, 149 F.3d 517, 523 (6th Cir. 1998)). "However, the eligible employee need not expressly mention the FMLA as the source of his right to request such leave." *Brenneman v. MedCentral Health Sys.*, 366 F.3d 412, 421 (6th Cir. 2004). The Sixth Circuit has "explained that 'the critical test for substantively-sufficient notice is whether the information that the employee conveyed to the employer was reasonably adequate to apprise the employer of the employee's request to take leave for a serious health condition that rendered him unable to perform his job.'" *Miles*, 515 F. App'x at 386 (quoting *Brenneman*, 366 F.3d at 421. While the employee need not

14

expressly mention the FMLA, he must "give[] the employer enough information for the employer to reasonably conclude that an event described in [the] FMLA . . . has occurred." *Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 451 (6th Cir. 1999).

In addition to being substantively sufficient, the employee's notice must also be provided "within the requisite time frame." *Brenneman*, 366 F.3d at 421. "The time frame depends on the foreseeability of the needed leave." *George v. Russell Stover Candies, Inc.*, 106 F. App'x 946, 949 (6th Cir. 2004). If the need to take leave is foreseeable and at least 30 days away, the employee must "provide the employer with not less than 30 days' notice, before the date the leave is to begin, of the employee's intention to take leave . . . ." 29 U.S.C. § 2612(e)(2)(B). Otherwise, the employee must provide notice "as soon as practicable." 29 C.F.R. § 825.302; 29 C.F.R. § 825.303.

Metro argues that Thompson never requested FMLA leave, nor did he inform his supervisor that he would be missing work on March 10. [DE 41-1 at 406]. Because of this, "[t]here was no way for LMPD to know that Plaintiff's son was allegedly chronically sick." [*Id.*]. In response, Thompson argues he provided the LMPD with enough information to conclude that he was qualified to take FMLA leave. [DE 42 at 752]. He maintains that he mentioned his son's frequent bouts of sickness and risk for histiocytosis X during his interview for the traffic unit and on various other occasions to Ward. [*Id.*]. He also contends that "prior to the proposed termination, LMPD, the PSU investigator, and Chief Gwinn-Villaroel" became aware of his son's purported chronic illness through Thompson's PSU interview. [*Id.* at 753].

Thompson does not address whether his need for leave was foreseeable or unforeseeable. Accordingly, he does not discuss whether the notice provisions of 19 C.F.R. § 825.302 (foreseeable leave) or 29 C.F.R. § 825.303 (unforeseeable leave) apply. The Sixth Circuit has advised that "based on the clear language of [the] regulations, intermittent leave is treated as a type of

15

foreseeable leave." *Render v. FCA US, LLC*, 53 F.4th 905, 915 (6th Cir. 2022). "In intermittent leave cases, the qualifying reason is known in advance, even if it is unclear when the condition will flare up and require time off." *Id.* (explaining that plaintiff's intermittent leave was foreseeable when his "depression and anxiety were known, and flare ups were foreseeable, even if [plaintiff] could not predict precisely when he would need to take FMLA leave days"). Here, Thompson maintains that he knew about the qualifying reason for FMLA leave in advance, yet he did not know which days his son would get sick. He therefore sought intermittent leave and was "required to comply with the foreseeable leave regulation." *Id.*

When, as here, FMLA leave is to be taken intermittently, "*notice need only be given one time*, but the employee shall *advise* the employer as soon as practicable *if dates of scheduled leave . . . were initially unknown*." *Id.* (quoting 29 C.F.R. § 825.302(a)). Thus, Thompson needed to give *formal* notice only once—when he first sought approval for intermittent leave. However, he was then required to advise LMPD as soon as practicable of the dates of the leave.

There is some evidence in the record suggesting that Thompson provided initial notice to his supervisors of a need to take FMLA qualifying leave. For instance, Thompson stated in his declaration that he informed his Traffic Unit interviewers in September 2022 that his son "was having ongoing respiratory issues, ear infections, and other health problems" and that he may need to take days off to care for his child. [DE 42-1 at 761]. Also in his declaration, Thompson stated, "I told Sergeant Ward and Lt. Keller multiple times about my son's frequent sicknesses, including his high risk for histiocytosis X, and my concerns about his sleeping and inability to function normally." [*Id.*]. Similarly, when asked if he ever spoke with anyone at LMPD about his son's illness, Thomson responded, "Sergeant Ward. . . . Like, I just told him my son was sick. He's been sick a lot, and that's it." [DE 41-4 at 627]. But even if these examples constituted notice of his

16

need to take intermittent leave, Thompson failed to advise his supervisor "as soon as practicable" of the date of the leave—March 10—when it arose.[3] Despite knowing of his need to take leave, Thompson failed to inform Ward of that intent until days after the fact.

Additionally, when the need for leave is foreseeable, "[a]n employer may require an employee to comply with the employer's usual and customary notice and procedural requirements for requesting leave" unless unusual circumstances justify the failure to comply. 29 C.F.R. § 825.302(d). "This includes 'requir[ing] employees to call a designated number or a specific individual to request leave.'" *Perry v. Am. Red Cross Blood Servs.*, 651 F. App'x 317, 328 (6th Cir. 2016) (quoting 29 C.F.R. § 825.303(c)). "If the employee does not comply with those requirements, then the FMLA does not give him the right to take leave." *Cundiff v. Lenawee Stamping Corp.*, 597 F. App'x 299, 300 (6th Cir. 2015). Here, Thompson failed to comply with LMPD's policy for requesting leave, which requires officers to "call their immediate supervisor or competent authority designated by the division/section/unit commander at least one (1) hour before the beginning of their shift." [DE 43-3 at 965]. On March 10, Thompson failed to call Ward—his supervisor—before the start of his shift, and he did not contact Ward to discuss the absence until March 14. [DE 42-13 at 896–97]. When asked if he believed that "Lieutenant Keller had designated Charlie Presley as a contact," Thompson stated "no," confirming that he understood that Presley was not the appropriate person to contact regarding his absence. [*Id.* at 897]. Thompson also confirmed this in the memorandum he wrote for Ward, in which he stated, "I did not contact my command officer when I was supposed to do so (one hour before my shift started)."

---

[3] The days of Thompson's other absences—December 15, 2022 and March 8, 2023—are irrelevant for purposes of FMLA notice. As stated above, Thompson was absent on December 15 due to his own sickness, and Thompson makes no argument that his own illness entitled him to FMLA leave. Thompson was absent on March 8 to meet with a roofer, which is not an FMLA-qualifying event.

17

[DE 42-4 at 817]. Thompson has not presented any unusual circumstances to justify his failure to comply with LMPD's leave policy.

Thompson was required to notify Ward of his intent to be absent on March 10, even if he previously provided general notice as to his son's illness. It is undisputed that Thompson failed to do so. As a result, there is no genuine dispute of fact with respect to whether Thompson provided sufficient notice of his intent to take leave.

### 3. Denial of Benefits (Prong 5)

Finally, Thompson must show that the LMPD "denied him benefits or rights to which he was entitled under the FMLA. *Donald*, 667 F.3d at 762. "If an employer takes an employment action based, in whole or in part, on the fact that the employee took FMLA-protected leave, the employer has denied the employee a benefit to which he is entitled." *Wysong v. Dow Chem. Co.*, 503 F.3d 441, 447 (6th Cir. 2007).

The record reflects that Gwinn-Villaroel recommended Thompson's termination for a variety of non-FMLA related reasons, including inputting overtime for a day he did not work a full shift, failing to indicate his three absences in the AgencyWeb timekeeping program, being absent from work on December 15 and March 8—neither of which involved FMLA-qualifying events, and signing his initials on the sign-in sheet for the March 10 class despite being absent. [DE 41-2 at 431–38]. While Thompson's March 10 absence also contributed to his proposed termination, this did not deny Thompson a benefit to which he was entitled, given that Thompson failed to establish that he was entitled to FMLA leave for his son's illness.

Moreover, the language of the FMLA "explicitly permits employers to condition FMLA-protected leave upon an employee's compliance with the employer's usual notice and procedural requirements, absent unusual circumstances." *Srouder v. Dana Light Axle Mfg.*, LLC, 725 F.3d

18

608, 614 (6th Cir. 2013); *see also* 29 C.F.R. § 825.302(d) ("Where an employee does not comply with the employer's usual notice and procedural requirements, and no unusual circumstances justify the failure to comply, FMLA–protected leave may be delayed or denied."). By Thompson's own admission, he failed to comport with LMPD's notice requirements. [DE 42-4]. Thus, even if Thompson were entitled to FMLA leave, LMPD's decision to discipline Thompson for failing to notify his supervisor of his intent to take leave would comport with the FMLA. *See Srouder*, 725 F.3d at 614 (finding that employee's termination for failing to comply with employer's notice and procedural requirements for claiming FMLA leave did not constitute FMLA interference); *Cundiff*, 597 F. App'x at 300 (finding no FMLA interference when plaintiff was terminated after an unexplained absence because he failed to call in as required by company policy).

Accordingly, Thompson has failed to establish a *prima facie* case of FMLA interference. For these reasons, the Court grants Metro's motion for summary judgment as to Count I.

B. Breach of Contract (Count III)

Thompson does not object to the dismissal of his breach of contract claim. [DE 42 at 757–58]. As a result, the Court grants summary judgment with respect to Count III.

C. ADA Violation (Count IV)

Metro argues that summary judgment should be granted as to Thompson's ADA claim because nothing in the record suggests that he suffers from any disability, so he cannot make a claim that LMPD failed to make a reasonable accommodation for him. [DE 41-1 at 407]. Metro also asserts that Thompson testified that his son has never been diagnosed with a disability, but even if he did, LMPD "was not required to make a reasonable accommodation for [Thompson's] son." [*Id.* at 408]. In response, Thompson argues that Metro misconstrued his ADA cause of action and addressed a claim that Thompson never raised. [DE 42 at 749]. Specifically, Metro moves for

19

summary judgment on a failure to accommodate claim, but Thompson maintains that that he "raised a claim of associational discrimination and alleges that he was discriminated against because of his close relationship with his disabled son." [DE 42 at 750]. He argues that, on this basis alone, summary judgment must be denied. [*Id.*]. Thompson further argues that summary judgment must be denied on the merits. [*Id.*].

### 1. *Metro's Failure to Address Thompson's ADA Claim*

The Court first addresses whether Metro has waived argument as to Thompson's ADA claim by addressing only failure to accommodate and not associational discrimination. Metro's motion seeks summary judgment on Count IV assuming that Thompson asserted a failure to accommodate claim under the ADA. [DE 41-1 at 407]. In other words, Metro understood Thompson's second amended complaint to allege a violation of 42 U.S.C. § 12112(b)(5)(A), which requires covered entities to "mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee." Metro therefore focuses its argument on Thompson's failure to present evidence of his own disability. Thompson argues that he actually asserted his ADA claim under 42 U.S.C. § 12112(b)(4), which prohibits covered entities from "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association."

Thompson claims that Metro's motion for summary judgment must be denied because Metro "failed to move for summary judgment on the actual allegations and cause of action raised in the Complaint." [DE 42 at 750]. In reply, Metro maintains that "[t]he nature of Plaintiff's claims relating to the Americans with Disabilities Act (ADA), have been, and remain, unclear." [DE 43 at 956]. On the contrary, Thompson's second amended complaint clearly alleges that LMPD

"discriminated against [Thompson] based on disability by relationship and association pursuant to 42 U.S.C. 12112(b)(4)." [DE 26 at 199, 207]. Thompson cites 42 U.S.C. § 12112(b)(4) as the basis for his claim repeatedly throughout the second amended complaint. [*See id.* at 199, 203, 207, 212, 213, 216]. He also specifically alleges that he was "discriminated against and otherwise excluded from and denied equal jobs or benefits because of the known disability of his son with whom [Thompson] is known to have a relationship or association." [*Id.* at 219]. The nature of Thompson's claim was therefore obvious from his second amended complaint.

Metro devotes its entire argument on Count IV to addressing a failure to accommodate claim that was not raised by Thompson. Specifically, Metro argues that nothing in the record suggests that Thompson himself has a disability or that LMPD failed to make a reasonable accommodation for him. [DE 41-1 at 207]. Metro also argues that Thompson testified that his son has not been diagnosed with a disability, and even if he had, the LMPD was not required to make an accommodation for Thompson—a non-disabled employee. [*Id.* at 408]. Only in reply does Metro address the elements of Thompson's actual claim—that LMPD "subjected Thompson to discrimination and harassment based on his association with his disabled son." [DE 42 at 750].

It is well established that "arguments raised for the first time in reply briefs are waived, and this applies both on appeal, and to summary judgment motions filed in the trial court." *Palazzo v. Harvey*, 380 F. Supp. 3d 723, 730 (M.D. Tenn. 2019) (citations omitted) (*citing American Family Prepaid Legal Corp. v. Columbus Bar Assoc.*, 498 F.3d 328, 335 (6th Cir. 2007) and *Ryan v. Hazel Park*, 279 F. App'x 335, 339 (6th Cir. 2008)). Accordingly, Metro's failure to challenge Thompson's actual claim in the motion for summary judgment constitutes waiver and alone could be grounds for denying summary judgment.

### 2. Associational Discrimination

Even if Metro's failure to address the associational discrimination claim does not altogether waive opposition, Metro nonetheless fails to meet its burden to demonstrate the absence of a genuine issue of material fact as to that claim. *See Celotex Corp*, 477 U.S. at 323. To establish a *prima facie* case of associational discrimination, a plaintiff must show that:

> (1) he or she was qualified for the position; (2) he or she was subject to an adverse employment action; (3) he or she was known to have a relative with a disability; and (4) the adverse employment action occurred under a circumstance that raises a reasonable inference that the disability of the relative was a determining factor in the decision.

*Stansberry v. Air Wisconsin Airlines Corp.*, 651 F.3d 482, 487 (6th Cir. 2011). Metro does not address these elements, other than to point to Thompson's testimony that his son "does not have a professionally diagnosed disability and/or medical condition." [DE 41-1 at 408]. Yet "a diagnosis is not necessary for an ADA claim to succeed," *Hrdlicka v. Gen. Motors, LLC*, 63 F.4th 555, 568 (6th Cir. 2023), and Thompson presents sufficient evidence to rebut Metro's limited argument.

Under the ADA, an individual is considered "disabled" if he: "(1) has a physical or mental impairment that substantially limits one or more of the major life activities of such individual, (2) has a record of such impairment, or (3) is regarded by her employer as having such an impairment. *Gruener v. Ohio Cas. Ins. Co.*, 510 F.3d 661, 664 (6th Cir. 2008) (internal quotation marks omitted) (quoting *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 810 (6th Cir. 1999)). Metro argues only that Thompon's son does not have a record of his impairment, but there are other ways to establish a disability. For instance, Thompson argues that his son had physical impairments that substantially limited his daily activities. [DE 42 at 751]. In doing so, he presents evidence that his son had frequent bouts of illness that prevented him from sleeping and required him to avoid public spaces. [DE 42 at 751; DE 42-1 at 760–61]. Thompson has therefore responded to Metro's narrow

22

argument with specific facts that show a genuine issue for trial, so summary judgment on his ADA claim is not appropriate. As a result, the Court denies summary judgment as to Count IV.

      3.   Punitive Damages (Count V)

Metro argues that Thompson's claim for punitive damages fails as a matter of law because there is no evidence that LMPD's actions rise to the level of willfulness required for punitive damages. [DE 41-1 at 409]. Thompson responds that "[i]t is the jury's job to determine if [LMPD's] actions were sufficiently intentional, fraudulent, malicious or reckless to support an award of punitive damages." [DE 42 at 758].

An ADA claimant can recover punitive damages by "demonstrat[ing] that the respondent engaged in a discriminatory practice . . . with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). "The terms 'malice' or 'reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." *Bates v. Dura Auto. Sys., Inc.*, 767 F.3d 566, 583 (6th Cir. 2014) (quoting *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 535 (1999)). "To be liable for punitive damages, 'an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law.'" *Id.* (quoting *Kolstad*, 527 U.S. at 536). An employer who is "simply unaware of the relevant federal prohibition or believe[s] that the discrimination is lawful [is] not subject to punitive damages liability." *Id.* (internal quotation marks omitted) (quoting *Preferred Props., Inc. v. Indian River Estates, Inc.*, 276 F.3d 790, 799 (6th Cir. 2002)).

Nothing in the record suggests that LMPD discriminated against Thompson in the face of a perceived risk that it would violate the ADA. There is no evidence, for instance, that Thompson raised an ADA issue while working at LMPD or during the PSU investigation. Moreover, the

23

content of the PSU report reveals that Thompson was recommended for termination pursuant to a thorough investigation that revealed several unexcused absences, failure to follow LMPD procedure, and improper reporting of time. Nothing in the report suggests that LMPD was aware that recommending Thompson for termination could constitute associational discrimination. Thompson simply claims that the question of punitive damages should be left to the jury but points to no evidence that LMPD consciously disregarded a risk of violating Thompson's federally protected rights. This is insufficient for purposes of summary judgment, where the nonmovant "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. Accordingly, the Court grants Metro's motion for summary judgment as to Count V for punitive damages.

## IV.    CONCLUSION

For the reasons above, the Court **GRANTS** Metro's motion for summary judgment [DE 41] as to Counts I, III, and V. The Court **DENIES** summary judgment as to Count IV.

Rebecca Grady Jennings, District Judge
United States District Court

June 16, 2026

24